Filed 1/22/25  P. v. Green CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B330515 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA419591) |
| v. | |
| BERLINDA GREEN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Berlinda Green (defendant) appeals from the order denying her petition for vacatur of her manslaughter conviction and for resentencing pursuant to Penal Code section 1172.6, entered following an evidentiary hearing.[1] Defendant contends the ruling was not supported by substantial evidence.

## BACKGROUND

An information was originally filed against defendant in March 2014 after a preliminary hearing. In November 2016 an amended information charged defendant and codefendants Ernest Lamont Williams, Thomas Woodson, and Anthony Boochee (also known as Tone) with the 1998 murder of Arlando Bryant (§ 187, subd. (a), count 1) and conspiracy to commit murder (§ 182, subd. (a)(1), count 2). The murder was alleged to be intentional and carried out for financial gain within the meaning of section 190.2, subdivision (a)(1). It was also alleged to be intentional and committed by means of lying in wait within the meaning of section 190.2, subdivision (a)(15). Both counts were alleged, pursuant to section 186.22, subdivision (b)(1), to have been committed for the benefit of a gang.

In 2016, defendant entered into a plea agreement under which she pled no contest to voluntary manslaughter (§ 192, subd. (a)) and admitted the gang allegation. Defendant was sentenced to a total of 21 years in prison, comprised of 11 years for the voluntary manslaughter plus 10 years for the gang enhancement.

---

[1] All further unattributed code sections are to the Penal Code unless otherwise stated.

**Defendant's petitions for resentencing**

In 2019 defendant filed a petition for resentencing under former section 1170.95. As originally enacted by Senate Bill No. 1437 (2017–2018 Reg. Sess.), former section 1170.95 did not extend its provisions to persons convicted of manslaughter. (See Stats. 2018, ch. 1015, § 4.) The trial court thus summarily denied the petition on that ground, and we affirmed the order in *People v. Green* (May 6, 2020, B296326) (nonpub. opn.). Effective January 1, 2022, the statute was amended to allow petitions by not only those convicted of murder but also those convicted of attempted murder and manslaughter. (Stats. 2021, ch. 551, § 2). Effective June 30, 2022, former section 1170.95 was renumbered section 1172.6. (Stats. 2022, ch. 58, § 10; see § 1172.6, subd. (a)(2).)

Section 1172.6 provides a procedure to petition for retroactive vacatur and resentencing for those who could not be convicted of murder under sections 188 and 189 as amended effective January 1, 2019. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957.) Sections 188 and 189, the laws pertaining to felony murder and murder under the natural and probable consequences doctrine, were amended "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

In 2022, defendant again filed a petition for resentencing. The prosecution was ordered to file a response. The trial court appointed counsel for defendant, considered further briefing, and ruled defendant had made a prima facie case for relief. The court then conducted an evidentiary hearing under section 1172.6,

3

subdivision (d)(3), based upon the preliminary hearing and plea transcripts.[2] As defendant was charged with murder, the prosecution was required to prove at the evidentiary hearing that, beyond a reasonable doubt, defendant is guilty of murder under the 2019 amendments to section 188 or 189, despite the plea to voluntary manslaughter. (§ 1172.6, subd. (d)(3).)

On April 27, 2023, after hearing argument from both counsel the court concluded the prosecution had met its burden, found the evidence showed defendant was guilty of express malice murder, and denied the petition.

Defendant filed a timely notice of appeal from the court's order.

**Preliminary hearing testimony**

### The 1998 murder

The evidence presented at the preliminary hearing for defendant and codefendants Williams, Woodson, and Boochee established that on December 20, 1998, defendant's husband Bryant was shot and killed while sitting in his parked car, in front of his home on Dwight Avenue. Bryant's life was insured for $119,900 and his policy named defendant and his three children as the beneficiaries.

### The reopened investigation

In 2013, Los Angeles Sheriff's Department cold case homicide investigator Detective Dean Camarillo was assigned as one of the investigating officers in this case. In August and September 2013, he obtained warrants and conducted wiretap surveillance on the telephones of defendant and her

---

[2] Defendant did not object to the use of the preliminary hearing transcript or any of the testimony. The plea transcript has not been included in the appellate record.

4

codefendants. He then conducted "stimulation activities" to encourage the targeted persons to speak on their phones.

On August 29, Detective Camarillo and his partner went to the Dwight Avenue house, spoke to the current resident, tenant Cynthia Thomas, who said she did not know defendant.[3] The detectives then went to the home of defendant's mother, identified themselves, and told her they were looking for defendant so they could introduce themselves and let her know the case was again being actively investigated. The detectives added that on September 4 they would be filming an episode of *L.A.'s Most Wanted* with Fox 11 News (Fox News) concerning the case. Detective Camarillo left his business card. Shortly after their visit with defendant's mother, the detectives listened to an intercepted call between defendant and her mother in which Bryant was mentioned, calling him by his nickname "Rev." Defendant said, "they just left my house, too. The lady just called me."

On September 4, when the detectives and Fox News arrived at the Dwight Avenue house, Thomas called defendant, saying she felt uncomfortable and that defendant needed to come to the location. When defendant arrived, Detective Camarillo introduced himself, told her the case was being reinvestigated, and they were reaching out to the public. She was not told she was a suspect. Detective Camarillo asked defendant whether she wanted to go on camera to ask the public for help in catching her husband's killer. She refused. The episode aired on September 7, 2013. No one on the show accused defendant of involvement in

---

[3] Immediately after the detectives left, a call was intercepted from Thomas to defendant.

5

the murder. In several phone calls made by defendant, she indicated having seen the show and sounded upset and disgusted.

Thereafter Detective Camarillo again spoke to defendant's mother at home, giving her the "good news" they had a sketch of a possible suspect and would distribute flyers throughout Compton. Flyers were prepared indicating investigators had received a tip as a result of the Fox News show, including a sketch of a suspect, drawn to resemble codefendant Williams, using a 1998 booking photo. Also on the flyer was a photograph of Bryant. Detective Camarillo distributed these flyers to defendant's mother and to Thomas. He then posted flyers at businesses and intersections around the neighborhood. Pole cameras were set up to monitor the flyers in certain areas including stores frequented by codefendants Boochee and Williams and near Williams's residence. Boochee was captured by camera looking at a flyer outside one of the stores.

Flyers were also distributed door to door. At Williams's home, a flyer was handed to Myesha C.[4] and to Williams's aunt. Williams soon called Christopher Williams to get his big brother Tone's number because Williams needed to talk to him about some "old shit." Immediately after that call, Williams phoned Boochee but received no answer. A few minutes later, Myesha called and Boochee answered. She passed the phone to Williams, who said, "Hey, Tone, I need you—I need to see you. I got something I need to show you." Boochee replied that he already knew what Williams was talking about and said, "It ain't nothing." Williams countered, "This is some serious shit," and he

---

[4] We use witnesses' first names for their safety because a witness received a threatening text sent from Williams's cell phone.

did not want to talk over the phone. Boochee continued saying it was nothing. In the background Myesha yelled, "It's some old shit," which Williams repeated, and Boochee said, "Don't worry about it." Before hanging up, Williams told Boochee, "Love you, dog."

Myesha was briefly hospitalized, and she wanted Williams to visit. As her phone calls with Williams were intercepted, Williams was heard to say he did not want to go out, and he could not show his face. The camera monitoring Williams's home did not show him leaving the house for two weeks after the flyers were distributed.

Detective Camarillo learned from Bryant's insurance company the proceeds of the insurance policy had been paid to defendant and the other beneficiaries in March 2000. A search warrant for defendant's home was obtained and served on December 19, 2013, the day of defendant's arrest. Documents pertaining to the victim's insurance policy, including letters to defendant's attorney from the insurance company were found. One letter dated March 1999 explained the company would not pay then because the death was being investigated as a homicide. A February 2000 letter informed defendant the company would hold all payments until there was an arrest in the case.

### *Myesha C.*

Myesha identified Williams in court as her ex-boyfriend, having been in a relationship for three years before breaking up seven months before the February 6, 2014 preliminary hearing. She testified to being at Williams's home on September 12, 2013, when police officers handed her a flyer that read: "[O]n December 20, 1998 Arlando Bryant was shot and killed in front of

his house on Dwight Avenue, Compton, on his way to work . . . ." The flyer also said: "Information wanted, murder investigation."

Myesha read the flyer and then showed it to Williams, because the police were handing it out everywhere in the neighborhood and it contained a sketch that resembled Williams, alongside a description of the "suspect." There was also a photograph of the "victim Arlando Bryant." After a minute Williams crumpled the flyer and told her to throw it away. A couple days later, Williams told Myesha the sketch was like looking at himself in the mirror.

Sometime within the year before the flyer came out, Williams told Myesha about a murder in which he was involved 15 years earlier, when he was paid to kill someone. Williams said Boochee offered to pay him $10,000 to kill a person he said was a "D.A." who had done something to him. Williams, Woodson and Boochee then rode to the victim's location in Boochee's car and parked there. Boochee drove, Williams was in the front passenger seat, and Woodson was in the back seat, drunk and asleep. A man was sitting in his car reading a newspaper. Williams, who wore a rag over his face, got out, went to the victim, tapped on the window and shot him in the head through the window.

In the days after the flyer came out, Myesha noticed Williams made many phone calls and was acting nervous. He was "jumpy all of the time." When she saw one of the flyers posted in the area, she tore it down because Williams's aunt told her to do so.

### Anita W.

Anita W. testified she had known Boochee since 1993 or 1994. They had a sexual relationship and remained good friends

8

for many years.  Boochee spoke to her quite a bit about defendant, with whom he was having a sexual relationship (defendant was then known as Berlinda Bryant) and was married to someone else.  Boochee claimed relationships with many women and Anita denied it bothered her.  She explained she was satisfied with the sexual nature of her relationship with Boochee, and "[w]hatever he was doing with others, that was on him."

Sometimes, after seeing defendant, Boochee returned to Anita "crying and sad," saying defendant would belittle him when they argued.  Boochee also told Anita he had an apartment where he would meet defendant, or they would meet at her home.  He also said defendant's husband worked at Boeing Aircraft and Boochee obtained medical care using Bryant's name.  Anita never met defendant but saw her once in the early 2000's, standing on her porch as Anita passed by.

Anita found out about defendant's husband's murder sometime after it happened, but not right away.  When she asked Boochee about it he was nonchalant and did not seem worried or scared until sometime later.  Boochee told Anita he and defendant were waiting for some insurance money.  When asked whether he had anything to do with the murder, Boochee said nothing.  Anita said, "[Y]ou done F'd up your whole life for her, a married woman, over lust and greed."  Boochee replied, "yeah." Anita asked whether defendant was involved in the murder, and Boochee replied, "All the way up to her eyeballs."  Otherwise Boochee never told Anita about defendant's involvement.[5]  Anita

---

[5]	Defense counsel objected in the preliminary hearing claiming this was an uncorroborated statement of an alleged coconspirator.  The objection was overruled based on *People v.*

9

claimed Boochee said nothing about why defendant's husband was murdered and never admitted or denied he had anything to do with the murder. However Anita then recalled she told detectives he said defendant wanted her husband dead for "money."[6] Anita assumed Boochee contracted someone to kill defendant's husband at defendant's request.

In 2002 Anita sent a four-page document to an investigating detective in this case with information regarding the murder. She wrote that the shooter hangs out in Kelly Park and was mentally a little slow. It also gave the address of the apartment where Boochee and defendant met up,[7] writing she assumed defendant was expecting insurance proceeds.

On cross-examination Anita testified that in 1998 Boochee had an Astro van with multiple rows of seats. Anita also admitted she was convicted in 1986 of filing a false income tax claim, and in 2008 she was convicted of bankruptcy fraud.

---

*Greenberger* (1997) 58 Cal.App.4th 298, and *People v. Cervantes* (2004) 118 Cal.App.4th 162. (See generally, *People v. Washington* (2017) 15 Cal.App.5th 19, 30–31.)

[6] Boochee once told Anita that after he asked defendant for money for school clothes for his children, defendant refused, saying "everything was on the wait list, waiting on the insurance file to be paid."

[7] The owner of the building testified defendant rented the apartment in October 1998, and in November 1998 Boochee moved in with her. Defendant moved out and Boochee became the sole renter on the rental agreement in January 1999. Boochee moved out in April 1999. In 2002, defendant and Boochee submitted an application to move back into the building but were turned down.

### *Williams's interview*

Williams agreed to be interviewed by Detective Camarillo on October 16, 2013, at the sheriff's station. Detective Camarillo showed him the flyer, and Williams denied both that the sketch looked like him and that he committed the crime. Williams said if he had done it, he would have worn a rag over his face, and the sketch showed a plain face. Detective Camarillo had interviewed Myesha two weeks earlier. She told him when describing the murder to her, Williams said his face was covered by a rag during the crime so there was no way anyone saw him, and Williams did not understand how the sketch came about.

### *Woodson's interview*

On October 29, 2013, Detective Camarillo interviewed Woodson, who initially denied involvement in the murder, then admitted participating in what he thought was a robbery. He and Williams met Boochee who was driving an Astro van. Williams got into the front passenger seat and Woodson got into the back. Williams said, "Let's get this guy and get paid." They sat parked on Spruce Street facing Dwight Avenue and waited for hours. Woodson fell asleep and woke up when the van door was slammed shut. He then saw Williams, who was out of his seat and asked Woodson if he wanted to get out. Woodson declined and fell back to sleep. Minutes later, the door slammed shut again, and he saw Williams in his seat. They returned to the place where Williams had left his car. As they exited the van, Woodson saw Williams hand Boochee a semiautomatic handgun.

A couple of weeks later, Woodson and Williams walked to the shop where Boochee worked. Woodson waited outside while Williams went in. Williams returned with some money he used

to buy Woodson some clothes and shoes, and himself a car and drugs.

## DISCUSSION

### I.    Section 1172.6 procedure and substantial evidence review

Defendant contends the evidence was insufficient to support the trial court's finding she was guilty of malice murder. We apply the substantial evidence standard of review. (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233–234.) On appeal from the denial of a petition after hearing, our task is to determine whether any rational trier of fact could have made the same determination beyond a reasonable doubt. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)

In conducting an evidentiary hearing under section 1172.6, subdivision (d)(3), the trial court sits as an independent fact finder (*People v. Vargas, supra*, 84 Cal.App.5th at p. 951) and must "'review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard . . .'" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480, quoting *People v. Clements* (2022) 75 Cal.App.5th 276, 298). Under the usual substantial evidence standard, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The standard is deferential, but the evidence in support of the judgment must be *reasonable, credible, and of solid value*; 'a mere possibility' or '[s]peculation is not substantial evidence' [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 120.) We defer to

12

the trial court's resolution of conflicts and credibility determinations. (*People v. Clements, supra*, at p. 298.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

We "begin with the presumption that the evidence . . . *was* sufficient, and the defendant bears the burden of convincing us otherwise." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) "[T]he defendant must present his case to us consistently with the substantial evidence standard of review. . . . [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the [ruling] may lie in the evidence he ignores." (*Id*. at p. 1574.)

## II. Substantial evidence supports the trial court order

Defendant has failed to meet her burden to convince us that there is insufficient evidence of her participation in this crime as an aider and abettor. The trial court stated it based its ruling on the record of conviction. In particular, the court had considered the petition, the parties' briefs, the plea transcript, and all five volumes of the preliminary hearing transcript, except the evidence admitted pursuant to section 872, subdivision (b). Defendant has not objected to the use of the preliminary hearing

13

transcript on appeal or any testimony contained therein,[8] nor has she identified any testimony admitted pursuant to section 872, subdivision (b).  In her briefs defendant has failed to explain the evidence contained in the preliminary hearing transcripts, except a few passages in her page-and-a-half summary, but then only in the light most favorable to her arguments.  Nor has defendant referred to or included in the record on appeal a transcript of her plea, which could have contained an admission.  (See *People v. Rivera* (2021) 62 Cal.App.5th 217, 235.)

Instead, defendant has referred to arguments made in the briefs filed in the trial court regarding the petition and an augmented clerk's transcript filed at defendant's request, containing volume 5 of the preliminary hearing transcript, mostly consisting of counsel's arguments to the court.  Defendant is required to summarize and discuss all relevant *evidence*, not the argument of counsel, particularly argument on her behalf.  (See *People v. Sanghera, supra*, 139 Cal.App.4th at p. 1573.)  Defendant's briefs have addressed selected arguments made below and in the People's appellate brief without any attempt to summarize the relevant evidence.

After the opening brief was filed this court granted the People's motion for augmentation of the record, which contained five volumes of preliminary hearing transcripts and copies of minute orders filed at the time of the preliminary hearing.  Defendant did not file an amended or supplemental opening brief, nor did she correct her statement of facts in her reply brief though it was filed nearly five months after the People's

---

[8]     During the preliminary hearing, counsel objected to some testimony, but defendant did not renew any of the objections in the section 1172.6, subdivision (d) hearing.

14

augmentation.  Also, defendant cites cases in which similar arguments were made based upon evidence adduced in *those* cases, not this case.  "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts."  (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

Defendant argues the prosecution witnesses at the preliminary hearing were not credible because their testimony was inherently unreliable, and thus the trial court's finding the witnesses were credible is not entitled to deference.  Unless it is inherently improbable or physically impossible, we accept testimony believed by the trial court.  (*People v. Barnes* (1986) 42 Cal.3d 284, 306.)  Evidence is not inherently improbable unless its falsity is apparent without resorting to inferences or deductions.  (*People v. Mayberry* (1975) 15 Cal.3d 143, 150.)  Here, defendant has resorted to inferences or deductions and has not shown inherent improbability.  Defendant states: "Anita [W.], a former lover of Boochee who was intensely jealous of [defendant], and who had suffered two fraud-related convictions testified at the preliminary hearing in this case that Boochee told her that [defendant] was involved in the murder of the victim."  Defendant points to no evidence of jealousy, other than defendant's own inference drawn from Anita's sexual relationship with Boochee.

Defendant also cites Anita's testimony that Boochee gave no details of defendant's involvement and denied all his involvement.  However, defendant did not object at the section 1172.6, subdivision (d) hearing to Anita's testimony given after she refreshed her memory by listening to a recording of her interview with detectives in which she said Boochee *did* tell her

15

why defendant wanted her husband dead—"money."[9]  Defendant did not object to Anita's "assumption" Boochee contracted with someone to kill defendant's husband at defendant's request, or to her telling detectives she thought defendant was the mastermind. Boochee said after he asked defendant for money, defendant refused and said that everything was waiting for insurance file to be paid.

The trial court did not find any of the witnesses to be incredible and based its findings on the totality of the evidence. Defendant has not shown the witnesses' testimony was inherently improbable or physically impossible; we therefore defer to the trial court's credibility determinations.  (See *People v. Barnes, supra*, 42 Cal.3d at p. 306; *People v. Clements, supra*, 75 Cal.App.5th at p. 298.)

Defendant argues Boochee could have planned the murder on his own after he learned about the insurance policy and the time Bryant usually left for work, which he could have done through his relationship with defendant.  Defendant also claims there was absolutely *no* evidence she had advance knowledge of Boochee's plan to kill Bryant or that she participated in such a plan, apparently equating "circumstantial evidence" with "no evidence."  "'"Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove [her] guilt beyond a reasonable doubt."'"  (*People v. Howard* (2010) 51 Cal.4th 15, 34.)  Defendant has drawn inferences in her favor without consideration of the evidence and inferences thereto upon which the trial court relied.  We must draw all reasonable

---

[9]  The parties have not made the recordings or other exhibits part of the appellate record.

inferences the trial court might have drawn from the evidence, including circumstantial evidence. (See *People v. Maury, supra*, 30 Cal.4th 342, 396.) As explained below, we find the more reasonable inference to be drawn, and the one apparently found by the trial court, is defendant knew of and participated in the plan to kill Bryant and shared Boochee's intent to bring it about.

The evidence supports the conclusion Boochee arranged the murder, and by his admission to Anita, he "[messed] up [his] whole life" for defendant. The trier of fact could properly construe a defendant's silence in the face of an implied accusation of crime as an adoptive admission. (See *People v. Jennings* (2010) 50 Cal.4th 616, 661.) Such an inference is further strengthened by Boochee's "yeah" reply to Anita's challenge. Add to the mix, Williams's expectation to "get paid" for Bryant's murder and Boochee's years-earlier offer to pay Williams $10,000 to kill a person described as a D.A. Two weeks after Williams killed Bryant, he went to Boochee's place of business to collect enough money to buy clothing for Woodson and a car for himself. A defendant aids and abets murder by encouraging or facilitating its commission sharing the perpetrator's intent to kill. (*In re Lopez* (2023) 14 Cal.5th 562, 585.)

A conspiracy to commit a specific intent crime is an agreement among two or more persons to commit the crime, with an express agreement regarding specific intent. (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1221; see §§ 182, subd. (a)(1), 184.) Thus one who aids and abets or conspires to commit a murder who shares the coconspirator's or perpetrator's intent to kill is guilty of the murder committed by the perpetrator. (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1144.) ""'[A] conspiracy may be inferred from the conduct, relationship, interests, and

17

activities of the alleged conspirators before and during the alleged conspiracy."'" (*People v. Tran*, *supra*, at p. 1221.) Similarly, in determining the knowledge and intent of an aider and abettor, factors that may be considered include "'presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

Whether Boochee or defendant came up with the scheme to kill defendant's husband for his life insurance proceeds, defendant's relationship with Boochee and her actions and statements before and after the murder show she was integrally involved in the plan. Boochee's relationship with defendant was close, as evidenced by his frequently speaking of defendant to Anita. Detective Camarillo testified that defendant's name was the only woman's name tattooed on Boochee's body. Though defendant's treatment of Boochee would at times make him cry, he remained in the relationship. Defendant also rented an apartment where he and defendant could meet, and a month before the murder he moved in there with defendant. Boochee received medical care through defendant's insurance using Bryant's name. Taken together these facts establish quite a close relationship between Boochee and defendant.

After the murder, although Boochee did not give Anita details of how defendant was involved in her husband's murder, he said defendant was involved "[a]ll the way up to her eyeballs" and that defendant told him the reason why she wanted her husband dead was for money.

Before the wiretaps were in place, defendant and Boochee communicated with each other on their cell phones in excess of 125 times between January 1, 2013, and August 29, 2013. On

August 29, after defendant learned the investigation to find Bryant's killer had resumed, she and Boochee met in person, in a parking lot. Thereafter they ceased all further communication with one another by phone. Detective Camarillo testified that defendant's refusal to go on camera to ask the public for help in finding her husband's killer was perplexing, in that she had not been informed she was a suspect. In intercepted phone calls soon after the airing of *L.A.'s Most Wanted*, defendant sounded upset and disgusted. In one such call, defendant sounded irate and said she was "fighting for her life" even though she still had not been informed she was a suspect in the case.

Defendant argues her refusal to cooperate with the investigation was just as consistent with the conduct of an innocent person wrongly targeted by the police as well as a reasonable exercise of her Fifth Amendment right under the federal Constitution to remain silent. We again reject defendant's self-serving inferences. Defendant had not yet been named as a suspect, was not questioned by law enforcement regarding her involvement, and did not remain silent. Moreover, she did not object to the evidence on that basis, and has thus forfeited any Fifth Amendment argument. (*People v. Huggins* (2006) 38 Cal.4th 175, 240, fn. 18.)

We conclude defendant has not met her burden of demonstrating the evidence was insufficient to support the court's ruling. Furthermore, we find the evidence discussed above and the reasonable inferences the trial court likely drew from them to be amply sufficient to support the court's finding that defendant could presently be convicted of murder under section 188 as amended effective January 1, 2019, such that any rational trier of fact could have made the same determination

19

beyond a reasonable doubt.  (See *People v. Vargas, supra*, 84 Cal.App.5th at p. 951.)

## III.  The People's argument

Defendant contends this court should reject the People's argument to the trial court that she was ineligible for relief under section 1172.6 "because she could not have been convicted of malice murder on a theory of 'imputed malice' under current Penal code sections 188 and 189."  As the argument was made to the trial court, it is not this court's role to accept or reject it.  The appellate court reviews lower court orders and judgments, and as defendant asserts the *prosecutor* erred, but makes no assignment of trial court error based upon this issue and has not claimed prejudice, we decline to address the issue.

## IV.  Constitutional contentions

Defendant contends that if section 1172.6 is deemed inapplicable to her it would violate her state and federal constitutional rights to equal protection and due process, and the proscription against cruel and unusual punishment.

Citing *People v. Schell* (2022) 84 Cal.App.5th 437, 444, the People point out that section 1172.6 is an act of lenity and does not afford the petitioner all the constitutional rights available at trial.  (See *People v. Palacios* (2024) 101 Cal.App.5th 942, 954–955.)  In reply, defendant concedes that "this may be true," but argues the People have mischaracterized defendant's claim. Defendant explains her assertion as: "[A]ssuming [defendant] is in fact *eligible for relief*, but resentencing relief is nevertheless denied to [her], such denial would be arbitrary and capricious and in violation of a state created liberty interest and [her] state and federal constitutional due process rights."

20

We cannot assume defendant is in fact eligible for relief under section 1172.6 because, as discussed in part II above, we have reviewed the evidence the parties placed before the trial court as well as the parties' arguments here and below, and we rejected defendant's claim that defendant's guilt of murder was not proven beyond a reasonable doubt. As we have rejected the assignment of error on which defendant bases the alleged constitutional errors, we need not reach her constitutional claims. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

## DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
ASHMANN-GERST, J.